## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

IN RE:                                                      In Proceedings
                                                            Under Chapter 11
STC, INC.,
                                                            Case No. 14-41014
              Debtor(s).

<u>OPINION</u>

      The debtor filed its First Amended Plan of Reorganization ("the Plan") on October 26, 2015, and the debtor's largest unsecured creditor, Global Traffic Technologies, LLC ("GTT"), objected.   A trial on the objections to confirmation was held on March 1, 2016.  After hearing the testimony of witnesses and arguments of counsel, the Court took the matter under advisement.  For the reasons set forth below, the Court finds that the Plan meets the requirements for confirmation under 11. U.S.C. § 1129, and accordingly, overrules GTT's objections to confirmation.

<u>Background</u>

A. <u>Description of the Debtor's Business</u>

      STC, Inc., the debtor in this case, is a locally owned business located in McLeansboro, Illinois, a small community in southern Illinois.   The company designs, manufactures and tests custom transformers, specialty electronics and magnetic components for a variety of applications, including aerospace, military and marine industries.  Among other things, STC manufactures components for GPS-based traffic control preemption systems.  The sale of traffic control preemption system components in Canada and the United States accounts for

approximately 50% of STC's annual gross revenue.[1]  In addition, STC designs and manufactures components for a system known as the EMTRAC system, which enhances public safety by improving first responders' response time to the scene of emergencies, and which reduces traffic accidents as emergency vehicles pass through intersections. STC provides ongoing services to existing EMTRAC customers throughout North America, including warranty service, technical support and expansion of systems.

STC was founded in 1986 by Brad Cross and his brother, as well as a third person identified in the Amended Disclosure Statement as John Cunningham (who left the company in 1989).[2]   Brad Cross has been the president of STC since 1988, and is currently the sole shareholder of the company.   At the present time, STC employs approximately 30 people, all of whom live within a 25-mile radius of McLeansboro.   At trial, Brad Cross testified that the company has employed as many as 50 and as few as 20 people, that the employees are loyal and have a history of longevity with the company, and that approximately one-third of the employees have been with the company for more than 20 years.    He further testified that despite the bankruptcy filing, STC's business has continued and customers have advised him of potential future purchases, if the Plan is confirmed.

B.  The Lawsuit and Subsequent Chapter 11 Filing

GTT, a long-time competitor of the debtor, sued STC and other parties in a patent infringement case captioned *Global Traffic Technologies, LLC v. Rodney K. Morgan, STC, Inc. and KM Enterprises, Inc.*, Case No. 10-4110 in the United States District Court for the District of Minnesota.  On September 20, 2013, the jury found in favor of GTT and against the defendants

---

[1] STC's First Amended Disclosure Statement Filed on October 26, 2015 at p. 5, admitted into evidence as STC's Exhibit O.
[2] STC's First Amended Disclosure Statement Filed on October 26, 2015 at p. 4, admitted into evidence as STC's Exhibit O.

and awarded damages in the amount of $5,052,118.  The jury also found that the defendants willfully infringed the patent in question.  The District Court denied all of the defendants' post trial motions and awarded additional, enhanced damages of $2,526,059 (one-half of the actual damages), plus prejudgment interest of $923,965 (calculated at 10% per annum from January 1, 2010 through October 31, 2013) and post judgment interest of $1,384.14 per day (10%).  *Global Traffic Technologies, LLC v. Emtrac Systems, Inc., Rodney K. Morgan, STC, Inc. and KM Enterprises*, 2014 WL 1663420, at*16  (D. Mn. April 25, 2014).   The defendants appealed and STC sought a stay of enforcement of the judgment in the Court of Appeals for the Federal Circuit.  That request was denied on August 25, 2014, and on September 11, 2014, STC filed the instant chapter 11 case.   On February 9, 2015, GTT filed its proof of claim in the amount of $8,938,146.10 based on the District Court judgment.

On June 4, 2015, the Court of Appeals issued an opinion affirming the trial court's finding of infringement, reversing the award of enhanced damages (based on GTT's failure to satisfy a two-part test for proving willfulness) and remanding to the District Court for entry of judgment consistent with the Court of Appeals' opinion.  *Global Traffic Technologies LLC, v. Rodney K. Morgan, KM Enterprises, Inc. and STC, Inc.*, 620 Fed.Appx. 895 (Fed.Cir.Mn. 2015). On remand, the District Court entered judgment in the amount of $5,052,118, plus prejudgment interest in the amount of $923,965 through October 31, 2013 and post-judgment interest of $1,384.14 for each day after October 31, 2013.  *Global Traffic Technologies LLC, v. Rodney K. Morgan, KM Enterprises, Inc. and STC, Inc.,* 2015 WL 5255300 (D. Mn. Sept. 9, 2015).  The reversal of the enhanced damages award reduced GTT's total claim to $6,412,087.10.  STC's Petition for a Writ of Certiorari filed with the United States Supreme Court was denied.  *STC, Inc. v. Global Traffic Technologies*, 2016 WL 763269 (U.S. Feb. 29, 2016).

3

<u>The Plan and Voting</u>

The Plan provides in Article 3.02 that administrative expense claims allowed under 11 U.S.C. § 503 will be paid in full on the effective date of the Plan.[3]   The Disclosure Statement estimates on pages 10-11 that administrative expense claims total $325,000.  In addition, the plan lists five classes of claims and interests:

- Class 1 – priority claims;[4]

- Class 2 – the secured claims of Peoples National Bank;[5]

- Class 3 – general unsecured trade creditors, with total claims of $73,002.40;

- Class 4 –GTT's judgment claim; and

- Class 5 – equity security holders of the debtor.

Classes 1 and 2 are unimpaired and will be paid in full on the later of the effective date of the Plan or the date on which said claims are allowed by a final, non-appealable order. Class 3 creditors are impaired and will be paid 75% of their claims on the effective date of the Plan. Class 4 (GTT's claim) is impaired and will be paid in full over nine years at 3% interest.  Class 5, consisting of the equity security holders, is impaired.  Those holders will not receive any distribution on account of their existing equity interests, except as described herein.

---

[3] The "effective date" is defined in Article VIII of the Plan on page 13 as "the first Business Day after the thirtieth (30th) calendar day following the day that the Confirmation Order becomes a Final Order except in the event that the Confirmation Order is stayed.  If the Confirmation Order is stayed, the 'Effective Date' will be the first Business Day after the later of the date the Confirmation Order becomes a Final Order and no stay of the Confirmation is in effect."

[4] According to the debtor's Disclosure Statement, the debtor does not anticipate any priority unsecured claims under 11 U.S.C. §§ 507(a)(1), (4), (5), (6) and (7).  STC's First Amended Disclosure Statement Filed on October 26, 2015 at p. 11, admitted into evidence as STC's Exhibit O.

[5] The Plan does not list the amount that will be paid to Class 2 on the effective date, and the parties did not clarify the amount at trial.   Peoples National Bank filed two secured claims, one for $36,018.85 and one for $59,067.60. At trial, STC submitted Exhibit T which showed, among other things, that the cash disbursements to the Bank on the effective date will be $11,599 and $52,432.  GTT did not dispute these amounts, and Exhibit T, discussed in more detail below, was admitted into evidence without objection.

4

Article VII of the Plan creates a "Creditor Trust." Paragraph 7.08 provides that upon the effective date of the Plan, 99% of the equity of the reorganized debtor will be delivered to the Creditor Trustee to be held for the benefit of creditors and to be distributed in accordance with the Plan. The remaining 1% of the reorganized debtor's equity will vest in Brad Cross in exchange for Mr. Cross's delivery of $58,815.60 to the debtor.[6]

Pursuant to paragraph 7.03, the debtor will make an initial payment of $800,000 to the Creditor Trustee on the effective date of the Plan. The Trustee will use these proceeds to make all payments required under the Plan (excluding payment of administrative claims, which are to be paid by the debtor on the effective date of the Plan). Paragraphs 7.05 through 7.07 the Plan provide that the initial payment of $800,000 will be distributed as follows:[7]

> Cash Payment to Holders of Class 2 Allowed Claims. On the effective date, the debtor or Creditor Trustee will deliver to the Class 2 creditors a check in the full amount of their allowed claims.

> Cash Payment to Holders of Class 3 Allowed Claims. On the effective date, the debtor or Creditor Trustee will deliver to the Class 3 creditors a check in an amount equal to 75% of their allowed claims.

> Cash Payment to Holders of Class 4 Allowed Claims. On the effective date, the Creditor Trustee will deliver to each holder of a Class 4 allowed claim (GTT) a check equal to the pro rata payment from the initial payment, after payment of Class 1, Class 2 and Class 3 claims.[8] Holders of Class 4 claims will then be paid in full as follows:
> (i) Debtor will deliver to the Creditor Trust annual payments in the amount of approximately $752,172, consisting of principal and interest on Class 4 allowed claims.

---

[6] *See infra* n. 20.
[7] The Court has not recited verbatim the entirety of paragraphs 7.05 through 7.07, but only those portions relevant to this Opinion.
[8] The Amended Plan shows the pro rata amount as $100,000. The Court assumes that this is a typographical error since the original plan showed the amount as $700,000 and the parties have proceeded as though the correct amount is $700,000.

5

Paragraph 7.08(b) requires the debtor to deliver the annual payment to the Creditor Trust on each anniversary date of the effective date of the Plan for a period of nine years.  Upon receipt of an annual payment, the Creditor Trustee will deliver 11% of the equity interests in the Creditor Trust to Brad Cross.  If the debtor does not timely make the annual payment, then 11% of the equity interests in the Creditor Trust will be distributed to GTT.

On December 16, 2015, the debtor filed an Affidavit of Balloting (Document No. 223). The Affidavit shows that Class 1 (priority claims, unimpaired) did not vote; Class 2 (Peoples National Bank, unimpaired) voted to accept the Plan; Class 3 (unsecured trade creditors, impaired) voted to accept the Plan; Class 4 (GTT, impaired) voted to reject the Plan; and Class 5 (equity security holders, impaired) voted to accept the Plan.

<u>Confirmation under 11 U.S.C. § 1129(b)(1)</u>

The requirements for confirmation of a chapter 11 plan are set forth in § 1129(a).  Among those requirements, the plan proponent must show that with respect to each class of claims or interests, such class has accepted the plan or such class is not impaired under the plan.  11 U.S.C. § 1129(a)(8).   Because GTT, an impaired creditor, voted to reject the plan, STC seeks confirmation under § 1129(b)(1) of the Bankruptcy Code, also known as nonconsensual confirmation or "cramdown."    Under § 1129(b)(1), the plan proponent must show that all of the requirements of § 1129(a) have been met – other than paragraph (8) – and that, as to the dissenting class, the plan is both fair and equitable and not unfairly discriminatory.  7 COLLIER ON BANKRUPTCY ¶ 1129.03 (16th ed. 2015).    The plan proponent bears the burden of proving by a preponderance of evidence that the requirements of § 1129(a) are satisfied.  *In re GAC Storage Lansing, LLC*, 489 B.R. 747, 755 (Bankr. N.D. Ill. 2013) (citations omitted).  "If the case is

nonconsensual, the proponent of the plan also has the burden of showing by a preponderance of the evidence that the requirements of Section 1129(b)(1) are met." *In re Sea Trail Corp.*, 2012 WL 5247175, at *4 (Bankr. E.D.N.C. Oct. 23, 2012) (citations omitted).

<u>GTT's Objections to Confirmation</u>

In support of its position that the Plan fails to satisfy the requirements of § 1129, GTT raises the following specific objections to confirmation:

- the debtor has gerrymandered the classes to create a potentially accepting impaired class;

- the Plan artificially impairs Class 3 in order to create a potentially accepting class under §1129(a)(10);

- the Plan is not proposed in good faith because it artificially impairs Class 3;

- the Plan is not feasible;

- the Plan is not fair and equitable under § 1129(b)(2).

The Court will address each objection separately.

A. <u>Separate Classification and Gerrymandering</u>

GTT argues that the Class 3 claims (unsecured trade creditors) and the Class 4 claims (GTT's judgment claim) should be classified together because the claims are substantially similar. According to GTT, the separate classification of these claims is inappropriate and a "transparent attempt to manufacture an assenting class."[9] In other words, GTT believes that the debtor has "gerrymandered" the classes to create a potentially accepting impaired class of creditors. Doing so, GTT argues, violates § 1122 of the Bankruptcy Code. Section 1122 provides:

---

[9] Global Traffic Technologies, LLC's Objection to Confirmation of Debtor's Amended Plan of Reorganization, p. 8.

> (a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.
> (b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

11 U.S.C. § 1122.   By its terms, § 1122 does not expressly prohibit the separate classification of similar claims. *Matter of Woodbrook Assocs.*, 19 F.3d 312, 318 (7th Cir. 1994).   Rather, it "requires only that dissimilar claims not be classified together."  *In re Multiut Corp.*, 449 B.R. 323, 333 (Bankr. N.D. Ill. 2011) (citations omitted).

Nonetheless, GTT cites *Matter of Greystone III Joint Venture*, 995 F.2d 1274 (5th Cir. 1991), *cert. denied sub nom. Greystone III Joint Venture v. Phoenix Mutual Life Insurance Co.*, 113 S. Ct. 72 (1992) in support of its argument that under § 1122, similar claims should be classified together.   In *Greystone*, the court stated that there is "one clear rule that emerges from otherwise muddled case law on §1122 claims classification:   thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan."  *Id*. at 1279.   The Seventh Circuit, however, has rejected *Greystone's* "one clear rule." In *Woodbrook*, the debtor's plan separately classified a §1111(b) unsecured deficiency claim from the unsecured claims of other creditors.   The court allowed the separate classification, finding that:

> The "one clear rule" is not easy to apply since it is not about "classifying similar claims;" it is about the debtor's purpose. Similarity is not a precise relationship, and the elements by which we judge similarity or resemblance shifts from time to time in bankruptcy….Thus, we cannot accept the proposition implicit in *Greystone* that separate classification of a § 1111(b) claim is nearly conclusive evidence of a debtor's intent to gerrymander an affirmative vote for confirmation.

*Matter of Woodbrook Assocs.*, 19 F.3d at 318.   In *Matter of Wabash Valley Power Ass'n*, 72 F.3d 1305 (7th Cir. 1995), *cert. denied sub nom. U.S. v. Wabash Valley Power Ass'n, Inc.*, 117 S. Ct. 389 (1996), *abrogated on other grounds by In re Castleton Plaza, LP*, 707 F.3d 821 (7th Cir. 2013), the Seventh Circuit cited *Woodbrook* and held:

> A debtor in bankruptcy has considerable discretion to classify claims and interests in a chapter 11 reorganization plan. While a debtor may not separately classify claims solely in order to "gerrymander an affirmative vote on reorganization," claims may be classified separately if "significant disparities exist between the legal rights of the holder[s of the different claims] which render the two claims not substantially similar." Claims may also be separately classified if there are "good business reasons" to do so or if the claimants have sufficiently different interests in the plan.

*In re Wabash Valley Power Ass'n*, 72 F.3d at 1321 (quoting *In re Woodbrook Assocs.*, 19 F.3d at 318).

Based on the holdings in *Woodbrook* and *Wabash Valley*, it is clear that separate classification is proper if the holders of the claims have significantly different legal rights, if a legitimate business reason exists for separately classifying the claims, or if the claimants have sufficiently different interests in the plan. Bankruptcy courts in the Seventh Circuit have reached the same conclusion. *See, e.g., Polite Enterprises Corp. Pty Ltd. v. North American Safety Products, Inc.*, 2014 WL 321668, at *5 (N.D. Ill. Jan. 29, 2014); *In re Dave's Detailing, Inc.*, 2015 WL 4601726, at *7 (Bankr. S.D. Ind. July 30, 2015); *In re Multuit Corp.*, 449 B.R. at 334; *In re Local Union 722 Intern. Broth. Of Teamsters*, 414 B.R. 443, 453 (Bankr. N.D. Ill. 2009).

1. Different Legal Rights

In the instant case, the Court finds that separate classification of the trade creditors' claims and GTT's claim was proper since the respective classes hold significantly different legal rights. While the claims of both classes are unsecured, the similarity ends there. The trade

creditors' claims are generally liquidated and undisputed, while GTT's claim arose from a judgment in a highly disputed patent infringement lawsuit. GTT's judgment claim is substantially larger than all of the trade creditors' claims combined, and it stands to be paid far more under the Plan than any other creditor.[10]    More importantly, and to the point, the Court disagrees with GTT's assertion that unsecured judgment creditors have the same rights as unsecured trade creditors.   To the contrary, as a result of the judgment entered in its favor, GTT has a myriad of remedies to pursue, including execution, garnishment, citations and the creation of a judgment lien.    (Indeed, GTT exercised some of those rights prior to the filing of STC's bankruptcy petition, which forced the filing.)     Those rights are not available to the trade creditors.  Furthermore, GTT may pursue recovery on its judgment against the other, non-debtor defendants.  Again, this option is not available to the trade creditors.

2. Legitimate Business Reason

In addition, a legitimate business reason exists for separately classifying the trade creditors' claims and GTT's claim. The routine extension of monthly services and supplies by the trade creditors is essential to STC's reorganization efforts and ultimately, to the survival and continuation of STC's business.   The trade creditors also benefit from a continuing relationship with STC.  Obviously, the same is not true for GTT.

Other courts have approved the separate classification of trade vendors and judgment creditors. For example, in *In re Texas Star Refreshments, LLC*, 494 B.R. 684 (Bankr. N.D. Tex. 2013), the claims of the unsecured trade creditors and a judgment creditor with an unsecured

---

[10] Some courts have found that this distinction alone is sufficient to find that claims are not substantially similar. *See, e.g., In re Indian Nat. Finals Rodeo, Inc.*, 453 B.R. 387, 400 (Bankr. D. Mont. 2011); *In re EBP, Inc.*, 172 B.R 241, 244 (Bankr. N.D .Ohio 1994).

claim of $921,754.91 were separately classified.   The court found the classification scheme

proper, explaining in part:

> The Class 4 creditors are TSR's trade vendors, those creditors that
> are critical to TSR's continued operations.   CFG [the judgment
> creditor] on the other hand is obviously a competitor to
> TSR….CFG's position reveals that its real desire and indeed the
> way in which it benefits the most is by TSR's liquidation.   Now,
> given the judgment it obtained, CFG essentially argues that TSR
> should not be given an opportunity to reorganize.   CFG's interest is
> therefore different from that of other unsecured creditors….TSR's
> trade vendors, in addition, have an interest in continuing to sell
> their products to TSR, just as TSR has a business need to continue
> purchasing their products.   The separate classification of trade
> vendors from CFG is reasonable and proper.

*Id.* at 696 (citations omitted).    Likewise, in *In re Havre Aerie No. 166 Eagles*, 2013 WL

1164422, at *14 (Bankr. D. Mont. March 20, 2013), the court found that a good business reason

existed for separate classification based on evidence that the debtor had to pay the trade

creditors' claims in order to remain in business under the plan.   *See also In re Indian Nat. Finals

Rodeo, Inc.*, 453 B.R. at 400 (legitimate business justification existed for debtor to classify the

judgment creditor's claim separately from other unsecured creditors based on the anticipated

future aid or contributions of money and/or services by the other unsecured creditors); *In re EBP,

Inc.*, 172 B.R. at 244 (separate classification appropriate because judgment creditor provides no

continuing benefit to the reorganized debtor while the trade creditors do provide "a potential

continuing benefit which will sustain the Debtor's business if confirmation is achieved").

    3. Different Interests in the Plan

    Finally, GTT is a direct and strong competitor of STC,[11] and as such, has a substantially

different interest in the Plan from the trade creditors.   If STC's plan is not confirmed, the

---

[11] At trial, Brad Cross testified that GTT has been STC's strongest, direct competitor since 2009-2010.

company has no chance of surviving.[12] With the elimination of STC as a significant competitor, GTT will substantially improve its position in the marketplace.  Clearly, GTT has a "non-creditor interest" in the reorganized debtor, and for that reason, separate classification of its claim is proper. "A non-creditor interest can justify separate classification if it gives [the creditor] 'a different stake in the future viability' of [the debtor] that may cause it to vote for reasons other than its economic interest in the claim."  *In re Texas Star Refreshments, LLC*, 494 B.R. at 696 (brackets in original) (citing *In re Save Our Springs (S.O.S.) Alliance, Inc.*, 632 F.3d 168, 174 (5th Cir. 2011)).  *See also In re Lightsquared, Inc.*, 513 B.R. 56, 83 (Bankr. S.D.N.Y. 2014) (separate classification is justified where claimant is a competitor of the debtor); *In re Premiere Network Services, Inc.*, 333 B.R. 130, 133 (Bankr .N.D. Tex. 2005) (a non-creditor interest in the reorganized debtor meets the "good business reason" and justifies separate classification of the creditor's claim).

## B. Artificial Impairment and Good Faith

GTT argues that the debtor has sufficient funds to pay the Class 3 trade creditors' claims in full on the effective date of the Plan and therefore has artificially impaired that class by proposing to pay only 75% of its claims.[13]   GTT contends that the debtor cannot artificially impair a class solely to create an accepting impaired class under § 1129(a)(10) of the Bankruptcy Code.

Section 1123(b) provides that "a plan may (1) impair or leave unimpaired any class of claims, secured or unsecured…." 11 U.S.C. § 1123(b)(1).  Under § 1124, a class of claims or interests is impaired under a plan "unless, with respect to each claim or interest of such class, the

---

[12] Brad Cross testified that when STC's bank accounts were frozen (because of the judgment against it), the company could not have continued in business without filing bankruptcy.
[13] At the same time, GTT argues that the Plan is not feasible because GTT does *not* have sufficient funds to make all of the required payments.  *See* feasibility discussion *infra* pp. 19-28.

plan (1) leaves unaltered the legal, equitable, and contractual rights [of the claim holders]….”  11

U.S.C. § 1124(1).  Any alteration of the rights of a class of creditors constitutes impairment.

*Matter of Wabash Valley Power Ass’n*, 72 F.3d at 1321.  A plan cannot be confirmed unless “at

least one class of claims that is impaired under the plan has accepted the plan….” 11 U.S.C.

§1129(a)(10).

    In support of its argument that the debtor cannot artificially impair the Class 3 claims,

GTT cites *In re Windsor on the River Assocs., Ltd.*, 7 F.3d 127 (8th Cir. 1993).   *Windsor* held

that a claim is not impaired – and therefore does not meet the requirement that at least one

impaired class has accepted the plan – if the alteration of the rights in question arises solely from

the debtor’s exercise of discretion and not from some economic need.  *Id*. at 132-33.

    Other appellate courts, however, reject the distinction between discretionary and

economically driven impairment.  In *In re L & J Anaheim Assocs.*, 995 F.2d 940 (9th Cir. 1993),

the Ninth Circuit held that “the plain language of section 1124 says that a creditor’s claim is

‘impaired’ unless its rights are left ‘unaltered’ by the Plan.  There is no suggestion … that only

alterations of a *particular kind or degree* can constitute impairment.”  *Id*. at 943 (emphasis

added).

    Similarly, in *In re Village at Camp Bowie I, L.P.*, 710 F.3d 239 (5th Cir. 2013), the Fifth

Circuit held:

> Today, we expressly reject *Windsor* and join the Ninth Circuit in
> holding that § 1129(a)(10) does not distinguish between
> discretionary and economically driven impairment….By
> shoehorning a motive inquiry and materiality requirement into
> §1129(a)(10), *Windsor* warps the text of the Code, requiring a
> court to “deem” a claim unimpaired for purposes of §1129(a)(10)
> even though it plainly qualifies as impaired under §1124.
> *Windsor’s* motive inquiry is also inconsistent with §1123(b)(1),
> which provides that a plan proponent “*may* impair or leave

> unimpaired any class of claims," and does not contain any
> indication that impairment must be driven by economic motives."

*Id.* at 245-46 (emphasis in original).    The court disagreed with Windsor's reasoning that

condoning artificial impairment would reduce § 1129(a)(10) to a nullity. "[T]his logic sets the

cart before the horse, resting on the unsupported assumption that Congress intended

§1129(a)(10) to implicitly mandate a materiality requirement and motive inquiry." *Id.* at 246.

The court concluded that a plan proponent's motive should instead be scrutinized under the good

faith requirement of § 1129(a)(3).

Finally, the Sixth Circuit recently held that the debtor's motives are irrelevant when

analyzing the classification of claims under §§ 1124 and 1129(a)(10).  The court found:

> That [the] impairment [of two minor claims] seems contrived to
> create a class to vote in favor of the plan is immaterial.  Section
> 1124(1) by its terms asks only whether a plan would alter a
> claimant's interests, not whether the debtor had bad motives in
> seeking to alter them.  The debtor's motives instead are expressly
> the business of §1129(a)(3) … [a]nd given that §1129(a)(3)
> expressly requires an inquiry into the debtor's motives in
> proposing the plan, there is no reason to graft that inquiry onto the
> plain terms of §1124(1).

*In re Village Green I, GP*, 2016 WL 325163, at *2 (6th Cir. Jan. 27, 2016).

The Seventh Circuit has not squarely addressed the question of whether a distinction

exists between discretionary and economically driven impairment under § 1129(a)(10).  It has,

however, noted that an artificial impairment analysis requires an inquiry into the debtor's

motives. In *Matter of 203 N. LaSalle St. Partnership*, 126 F.3d 955 (7th Cir. 1997), *rev'd on*

*other grounds, Bank of America Nat. Trust and Savings Ass'n v. 203 North LaSalle St.*

*Partnership*, 119 S. Ct. 1411 607 (1999), the debtor proposed a plan in which the trade claims

were not paid in full.  Bank of America argued, in part, that the only reason for not paying the

trade creditors in full was to create an impaired class that would vote to accept the plan.  The

Seventh Circuit stated:

> Although we have never before adopted the Eighth Circuit's
> "artificial impairment" test, we believe that, even assuming that the
> Eighth Circuit's interpretation of § 1129(a)(10) is the appropriate
> standard, the bankruptcy court did not err in its application here.
> We have noted, in discussing *In re Windsor*, that "[a] finding of
> 'artificial impairment' requires an inquiry into the purposes of the
> debtor."  *In re Wabash*, 72 F.3d at 1321 n.10.  *In re Windsor*
> recognizes that the question of motivation is one for the
> bankruptcy court, whose resolution of the question is entitled to
> deference….The bankruptcy court found that there were legitimate
> reasons for impairing the trade claims class.  Impairing these
> claims allowed more money to be dedicated to the successful
> reorganization of the debtor.   The court distinguished this situation
> from the one at issue in *In re Windsor* in which the only
> impairment was to wait 60 days to pay the "artificially impaired"
> class in full, and the debtor's only purpose for doing so … was to
> create an impaired class to approve the plan.   In short, the
> bankruptcy court explicitly found that there was no lack of good
> faith by LaSalle's failure to pay the trade claims in full.  We are
> not left with the definite and firm conviction that the bankruptcy
> court has made a mistake with respect to this issue.

*Matter of 203 N. LaSalle St. Partnership*, 126 F.3d at 968.

Another case within the Seventh Circuit, *In re Greenwood Point, LP*, 445 B.R. 885

(Bankr .S.D. Ind. 2011), addressed artificial impairment under § 1129(a)(10).   The debtor in

*Greenwood* separately classified a secured tax claim, and proposed deferred interest payments of

$12,422.80 on the claim over two months after the effective date of the plan, even though the

debtor had sufficient funds to pay the amount on the effective date. A creditor objected on the

basis that the claim was artificially impaired for the sole purpose of obtaining acceptance by at

least one impaired class.   The court first found that "[i]f the motivation of the debtor was to alter

treatment of a class solely to obtain plan approval by at least one impaired class, *and for no

legitimate business purpose*, the class is artificially impaired and its acceptance cannot be used to

satisfy Section 1129(a)(10)." *Id*. at 908 (emphasis added) (citations omitted).   The court further found that "nothing in the Bankruptcy Code prevents a debtor from negotiating a plan in order to gain acceptance, including impairment of claims." *Id*.   "[A] plan proponent may impair a class of claims" and [i]f the impaired class accepts the plan, the requirement of section 1129(a)(10) is satisfied." *Id*.   The court concluded that the impairment was not *de minimus* and that because the debtor had good business reasons to treat the impaired class as it did, the class was not artificially impaired under § 1129(a)(10).

The Court finds the reasoning of the Ninth, Fifth and Sixth Circuits persuasive and holds that under the classification scheme set forth in §§ 1123(b)(1) and 1124(1), a chapter 11 plan proponent may impair a class of claims.  For purposes of § 1129(a)(10), it is immaterial whether the impairment is discretionary or driven by economic motives. The classification and treatment of claims is, however, subject to the good faith requirement under § 1129(a)(3).  *In re Village Green I, GP*, 2016 WL 325163, at *2; *In re Village at Camp Bowie I, L.P.*, 710 F.3d at 247. Engaging in a good faith analysis is consistent with the Seventh Circuit's finding that resolution of an "artificial impairment" issue requires the court to inquire into the debtor's motives.  *In re Wabash Valley Power Assn.*, 72 F.3d at 1321 n. 10; *Matter of 203 N. LaSalle St. Partnership*, 126 F.3d at 968.

Section 1129(a)(3) requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."   11 U.S.C. § 1129(a)(3).   "Good faith" is not defined in the Bankruptcy Code, but "the term is generally interpreted to mean that there exists 'a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'"  *Matter of 203 N. LaSalle St. Partnership*, 126 F.3d at 969 (citing *In re Madison Hotel Assocs.*, 749 F.2d 410, 424-25 (7th Cir. 1984)).   A bankruptcy court's finding that

16

a plan was proposed in good faith is a finding of fact that is given deference on appeal. *Matter of*

*203 N. LaSalle St. Partnership*, 126 F.3d at 969.

In determining whether a plan has been proposed in good faith, the focus is on the plan itself, which the court must view "based on the totality of the circumstances surrounding the development and proposal of that plan." *In re Draiman*, 450 B.R. 777, 804 (Bankr. N.D. Ill. 2011). The plan must have "a true purpose" and "fact-based hope" of preserving a going concern or of maximizing property available to satisfy creditors. *Id*. If a plan is proposed "with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of § 1129(a)(3) is satisfied." *In re Village at Camp Bowie I, L.P.*, 710 F.3d at 247. *See also In re Texas Star Refreshments, LLC*, 494 B.R. at 694 (a plan proposed in good faith must have reorganization as its honest and legitimate purpose).

GTT contends that the Plan was not proposed in good faith because it arbitrarily and artificially impairs the claims of the trade creditors solely to create an assenting impaired class. According to GTT, reducing the amount paid to trade creditors by $18,250.60 is a minimal impairment and serves no valid reorganizational purpose. The Court disagrees.

According to the testimony of Brad Cross, the reason STC filed for bankruptcy was because of the judgment held by GTT. The debtor was otherwise current on its obligations and owed no taxes at the time of filing. Brad Cross testified that once GTT froze its bank accounts, it could not have continued in business without filing. It was clear from his straightforward and credible testimony that, as president of STC, he wanted to do everything possible to save the company, as well as the jobs of its long-time and loyal employees. The only means to do so was to propose a plan that would allow STC to successfully reorganize.

Considering the totality of the circumstances - the judgment that left the debtor with no choice but to file bankruptcy, the debtor's desire to continue its business and to keep people employed, and the proposal of a plan that has a reasonable hope of success - the Court finds that the plan was proposed in good faith. The Plan is, in fact, a "plan of survival" and clearly meets the rehabilitative purposes of chapter 11. The reduced payment to the Class 3 trade creditors is not *de minimus*, as GTT contends. Brad Cross testified that STC's desire was to "save every dollar." A 75% reduction in payments to Class 3 leaves the debtor with an additional $18,250.06, a significant savings. GTT's argument that the debtor has sufficient funds to pay the trade creditors in full does not automatically result in a finding of bad faith. *See In re Village at Camp Bowie I, L.P.*, 710 F.3d at 248 (artificial impairment does not constitute bad faith as a matter of law). While STC does have sufficient funds to pay the Class 3 claims in full, it is also important for the debtor to retain enough funds to continue in operation.[14] Thus, it is understandable that every dollar would count. Moreover, the Plan proposes to pay GTT's claim *in full with interest*, albeit over a period of nine years. Under the terms of the Plan, GTT will receive nearly $1.5 million in one year, an amount that is just slightly less than the liquidation value of STC,[15] and over the course of the Plan, GTT will be paid more than $7 million.[16] In sum, the Court finds that the debtor has proposed a plan with the legitimate and honest intention of successfully reorganizing. As such, the good faith requirement of § 1129(a)(3) is satisfied.

A final note regarding the question of good faith: During closing arguments, counsel for

---

[14] At the same time, GTT argues that the debtor cannot satisfy the feasibility requirement because the debtor does *not* have sufficient funds to make the required Plan disbursements. *See* feasibility discussion *infra* pp. 19-28.

[15] The debtor's Liquidation Analysis, admitted into evidence at trial as part of Exhibit O, shows that STC's liquidation value is $1,704,750. Brad Cross testified without objection as to how the liquidation value was calculated.

[16] In contrast, if STC were liquidated, GTT would be paid only 25.98% of its claim. STC's Liquidation Analysis, Exhibit O.

GTT cited the Sixth Circuit's recent decision in *In re Village Green I, GP*, 2016 WL 325163 (6th Cir. Jan. 27, 2016) to support its argument that STC's Plan is not proposed in good faith.  In *Village Green*, the debtor owed its former lawyer and accountant a total of less than $2400.  The debtor created a separate class for those two creditors and impaired the class by proposing to pay the claims in full over sixty days rather than up front.  Debtor argued that the impairment was justified by the debtor's need to "ration every dollar."  The court found the debtor's reasoning "dubious," and held that the separate classification of the claims violated § 1129(a)(3)'s good faith requirement.  *Id*. at *2.

The facts of *Village Green* are clearly distinguishable.  The only other creditor in the case was Fannie Mae, a secured creditor that was owed $8.6 million.  There were no other unsecured creditors.  Debtor's expected monthly net income after confirmation was $71,400, which the court found was more than enough to pay de minimus claims of $2400.  The court in *Village Green* also found that the lawyer's and accountant's close alliance with the debtor "only compounds the appearance that impairment of their claims had more to do with circumventing the purposes of § 1129(a)(10) than with rationing dollars."  *Id*.   In short, the finding of bad faith in *Village Green* was based on a set of facts completely different from those before this Court

C. Feasibility

GTT contends that the debtor does not have sufficient funds to make the cash disbursements under the Plan and to thereafter continue its business.  Accordingly, GTT argues, the plan fails to meet the feasibility requirement of § 1129(a)(11).

In order for a plan to be confirmed, the plan proponent must show that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such

liquidation or reorganization is proposed in the plan."  11 U.S.C. § 1129(a)(11).  In other words, the plan must be feasible.  To satisfy the feasibility requirement, the plan proponent must offer evidence of cash flow to fund and maintain its operations and obligations under the plan.  *In re Multiut Corp.*, 449 B.R. at 347.    A plan proponent is not required to prove that the plan is guaranteed to succeed.  *Matter of 203 N. LaSalle St. Partnership*, 126 F.3d at 961-62.  Rather, the proponent must establish only a "reasonable assurance of commercial viability."  *Id*.    In determining feasibility, courts have considered such factors as the company's earning power, the sufficiency of the capital structure, economic conditions, managerial efficiency, and whether the same management will continue to operate the company.  *In re American Consol. Transp. Companies, Inc.*, 470 B.R. 478, 490 (Bankr. N.D. Ill. 2012) (citing *In re Clarkson*, 767 F.2d 417, 420 (8th Cir. 1985)).

In the instant case, STC called two witnesses to testify as to the Plan's feasibility.  The first witness, Russell Monroe, is the debtor's accountant.  The Court found Mr. Monroe's testimony to be very credible.  He testified that he has been the company's accountant since 1988 and has a thorough understanding of the company's books and records.  In addition to advising STC as needed, he spends at least one-half day each month at the debtor's business location.  His visits include meetings with management.  Mr. Monroe testified that he assisted in preparing all of the debtor's monthly operating reports during the bankruptcy proceeding, as well as a document entitled "Projections of Cash Flow and Earnings for Post Confirmation Period" ("Projections").  The document, admitted into evidence as STC's "Exhibit F of Exhibit O," shows total income, costs of goods sold, gross profit, operating expenses, and net income for the years 2011-2012 through 2014-2015, and projected results for the same categories for the years 2015-2016 through 2023-2024.  The Projections also show projected income after payments to

the Creditor Trust for the years 2015-2016 through 2023-2024.  In preparing the Projections, Mr. Monroe consulted with STC's management, reviewed the company's books and records, and considered expected trends and normal fluctuations in the business.  The Projections show a net profit going forward.  Mr. Monroe testified that the Projections are not perfect, but they are sound and reasonably achievable, even with possible downturns in the business and payments to the Creditor Trust.   He noted that even if the revenue projections were off by as much as $200,000 going forward, the company would still operate at a profit.  If sales dropped, for example, there would be a corresponding drop in expenses.

On cross examination, Mr. Monroe acknowledged that the debtor's total income decreased during the period from 2012 to 2015.  The Projections show total income of $4,762,442 in 2012-2013; total income of $4,584,563 in 2013-2014; and total income of $4,141,216 in 2014-2015.  The projected total income for 2015-2016 increases to $4,660,000.  Mr. Monroe explained that the basis for the increase is an expected growth in the magnetic components portion of the debtor's business once the Plan is confirmed and customers are assured that the business will continue.[17]

The Projections also show that the lowest projected income after payments to the Creditor Trust is $219,850 (for 2015-2016).   Mr. Monroe admitted, on cross examination, that STC's operating results were never that high during the period from 2011-2014.  He explained that this was likely due to the high litigation costs incurred by the debtor during that time.  For example, he noted that the debtor's legal fees in 2012-2013 were $921,587, and in 2013-2014, the fees were $874,064.

---

[17] Additionally, Brad Cross testified that the patent at issue in the infringement case is no longer protected, further alleviating customer concerns.  According to Mr. Cross, confirmation of the Plan will also prevent competitors from using the bankruptcy to scare STC's customers.

The debtor's expert witness, Richard Harmon, also testified as to the Plan's feasibility. Again, the Court found Mr. Harmon to be a very credible witness.  He earned a B.S. degree in electrical engineering from the University of Missouri-Rolla and a J.D. degree from Washington University in St. Louis.  He currently owns and operates Harmon Group - or HG, Inc. - a national consulting business that has been in existence for more than thirty years.  Mr. Harmon testified that HG, Inc. provides restructuring and bankruptcy advice to a wide variety of companies, including financial services businesses. Mr. Harmon's primary clientele, however, are manufacturing and distributing companies. For example, he has worked with electronic component manufacturing companies and is currently a 50% owner of WestOak Industries, Inc., a contract electronic manufacturing services company.   Based on his background and experience and pursuant to STC's uncontested request at trial, Mr. Harmon was accepted as an expert on the valuation of businesses.

Mr. Harmon described himself as a "manufacturing guy, an operations guy," who believes it is important to "put your feet on the ground" when acting as a restructuring consultant for a company.   He further testified that he has worked with STC as a restructuring consultant in the instant bankruptcy proceeding.  In that capacity, Mr. Harmon visited STC's business on at least two occasions and as recently as February 29, 2016. Over the course of those visits, he spent a total of eight or more hours at STC's facility, personally evaluating such things as component costing, materials, work flow processes, and quality and source control.  He stressed that, in his opinion, source control and quality processes are key to ensuring a loyal and responsive customer base.

Mr. Harmon's visits to STC also allowed him to converse with the employees, including those who have primary responsibility for administering and managing the manufacturing

operations. Mr. Harmon was given free access to the books and records of the company and all data that he requested. He also was given free access to STC's accountant, Mr. Monroe, without Brad Cross being present. Mr. Harmon testified that he was "very impressed" with STC's operations. He emphasized that STC is exactly "right sized" for its business operations and work processes. He further stated that Russell Monroe's long-time history with STC and familiarity with the company's operations and finances make him imminently qualified to evaluate whether the proposed Plan is feasible.

Using Mr. Monroe's Projections and his own multi-tiered evaluation model, Mr. Harmon prepared a report that was admitted into evidence as STC's Exhibit T. The report shows, among other things, STC's sources and use of funds, a projected income statement, a proforma projected balance sheet and a proforma projected cash flow statement. In Mr. Harmon's opinion, the going concern value of STC is between $4.8 and $5.8 million. He based his estimated values on his report and further considered such things as stability of revenue, predicted gross margin performance, the success of the magnetic components portion of the business (which he referred to as a "cash cow"), and the potential growth and evolution of the electronics portion of the business.

In his report, Mr. Harmon used a conservative approach when determining the amount of cash needed to make all payments on the Plan's effective date. Although the Plan calls for payments to Classes 2, 3 and 4 to be made from the initial payment of $800,000, Mr. Harmon calculated that the debtor will need $800,000 *plus* an additional $118,783 (which is the combined amount owed to the Class 2 and 3 creditors).[18] Thus, according to his figures, the debtor will need a total of $918,783 to make the required disbursements on the effective date. With

---

[18] At trial, GTT did not contest the accuracy of the $118,783 figure.

$1,247,674 in cash on hand as of December 2015,[19] Mr. Harmon concluded that the debtor can easily make the effective date cash payments. Even after the required cash payments are made, the contribution of $58,816 by Mr. Cross[20] leaves the debtor with a total of $387,707 cash,[21] an amount that Mr. Harmon firmly believes is sufficient working capital for the debtor's business to move forward. In sum, Mr. Harmon concluded that the plan is indeed feasible, that the debtor will be more likely than not to perform under the terms of the plan, and that based on the Liquidation Analysis, GTT will receive – by the end of 2017 – more than it would receive in a liquidation proceeding.

During cross examination, GTT's counsel pointed out that Mr. Harmon's report did not specifically account for payment of administrative expenses in the amount of $325,000. On redirect, Mr. Harmon noted that the debtor would have not only $387,707 in cash going forward, but also $474,399 in accounts receivable from which to pay the administrative expenses. No evidence was presented as to when those accounts receivable would be collected or whether the debtor would have those funds on hand on the Plan's effective date. However, even assuming that those funds are not available on the effective date, the evidence shows that STC still has sufficient funds to make the required cash disbursements:

| | |
|---|---|
| Cash on Hand | $1,247,674 |
| Payment to Creditor Trust[22] | - $800,000 |
| | $447,674 |
| Contribution by Brad Cross | +$58,816 |
| | $506,490 |

---

[19] STC's December 2015 Operating Report, admitted as STC's Exhibit KK, shows cash on hand at the end of December of $1,247,464.

[20] Mr. Harmon testified that based on the going concern value of STC, payment of $55,00 to $56,000 would be a fair exchange for 1% equity in the reorganized debtor. He stated that Mr. Cross' payment of $58,816 was "very fair."

[21] $1,247,674 - $918,783 = $328,891 + $58,816 = $387,707.

[22] Because he used a conservative approach in his calculations, Mr. Harmon estimated that the debtor will need $918,783 to make the effective payments. The Plan itself calls for the Class 2, 3 and 4 creditors to be paid from an initial cash payment of only $800,000.

Administrative Expenses            <u>-$325,000</u>
                                            $181,490

GTT's expert witness, William Haase, also testified as to the Plan's feasibility. Mr. Haase has a background in underwriting and analyzing loans. He is the founder and managing director of Certus Financial, a financial services company that provides financial advisory services related to distressed projects and arranges debt for its corporate clients. When offered as an expert witness, STC's counsel objected that GTT failed to offer a foundation establishing Mr. Haase as an expert in evaluating businesses. Notwithstanding the absence of such a foundation, the Court permitted him to testify, but advised the parties that the lack of a foundation would bear on the weight of his testimony.

Mr. Haase prepared a report that was admitted into evidence as GTT's Exhibit 1. He testified that in preparing the report, he reviewed STC's historicals, operations, projections going forward, monthly operating reports, the amended disclosure statement and plan, balance sheets and various exhibits. Based on the figures in his report, Mr. Haase testified to the following: (1) once the secured debts of Peoples National Bank are paid, STC will have no encumbered assets or payments to other lenders; (2) STC has current assets worth $2.4 million; (3) STC's cash on hand at the end of October 2015 was $1,032,175 – after deducting approximately $213,811 for payroll; (4) effective date payments total $1,177,317, leaving the debtor with a negative cash balance post-confirmation; and (5) debtor's calculations are not realistic. Mr. Haase further testified that STC's cash position has improved over the past eighteen months while in bankruptcy, but has increased by only $11,000 between February and December 2015. In addition, he stated that there has been no material increase in inventory or accounts receivable since February 2015 and no proof of an increase in customer orders.

While the Court cannot completely reconcile the differences in the calculations made by the opposing expert witnesses, the Court finds the testimony of both Mr. Monroe and Mr. Harmon to carry more weight than that of Mr. Haase.  Mr. Monroe, a CPA who has been STC's accountant for twenty-eight years, is highly and unquestionably qualified to evaluate whether STC can meet its financial obligations under the Plan and continue in business.  He concluded that STC could do both.  The Court believed him.  Likewise, Mr. Harmon, who has provided restructuring and bankruptcy advice to manufacturing and distributing companies for more than thirty years, clearly established himself as an expert in evaluating a business such as STC.  In addition, he spent time "on the ground" at STC's facility in McLeansboro, reviewing company records, talking with management and employees and "getting the picture" of how STC operates.

The same cannot be said of Mr. Haase, who did not speak to anyone from STC, who did not take the time to visit STC's facility and view its operations, and who based his report solely on a review of documents.  His projections were based on numbers from October 2015, and his report focused on the "trailing 12 months" while the debtor was in bankruptcy, a period that admittedly had weaker sales months.  He did not have any conversations with the debtor to understand historical ebbs and flows or future opportunities.  While he may have experience in underwriting and analyzing loans, the lack of foundation establishing Mr. Haase as an expert in the evaluation of businesses such as STC further lessens the weight the Court is willing to give his testimony.

The Court has one final observation regarding Mr. Haase's testimony.  He deducted $325,000 as administrative costs in arriving at his conclusion that STC would have a negative

cash balance post-confirmation. Using cash available at the end of October 2015 of $1,245,909 and payroll expenses of $213,800,[23] his calculation is roughly as follows:

| | |
|---|---|
| Cash available at the end of October | $1,245,909 |
| Payroll Expenses | -$213,811 |
| | $1,032,098[24] |
| Plan obligations (includes administrative costs) | -$1,177,317 |
| | -$145,219 |

Mr. Haase used the $325,000 figure from the debtor's Amended Disclosure Statement. Included in the $325,000 was an estimated $215,000 for "expenses arising in the ordinary course of business including trade payables." Wages would appear to be an ordinary course expense. Thus, it appears that Mr. Haase is double accounting for payroll.

Did the debtor prove that the Plan is guaranteed to succeed? No, but such proof is not required. Instead, the plan proponent must show a "reasonable assurance of commercial viability." *Matter of 203 N. LaSalle St. Partnership*, 126 F.3d at 961-62. The Court finds that the debtor has shown credible, concrete evidence of sufficient cash flow to fund and maintain both its obligations under the Plan and its business operations, and accordingly, overrules GTT"s feasibility objection.[25]

D. <u>Fair and Equitable</u>

Having determined that the Plan meets all applicable requirements of § 1129(a), the Court now considers whether the Plan can be confirmed under § 1129(b), the "cramdown" provision of the Code. Section 1129(b) provides:

---

[23] Debtor's Monthly Operating Report for October 2015, admitted into evidence as STC's Exhibit HH, shows cash on hand of $1,245,909. Payroll expenses of $213,811 for 2014-2015 are listed in STC's Exhibit F of Exhibit O and in GTT's Exhibit 1-D.

[24] Mr. Haase calculated this figure as $1,032,175, but the discrepancy in calculations is nominal.

[25] Even if STC's projections are aggressive, as GTT contends, courts will find a plan feasible "where the projections are credible, based upon the balancing of all testimony, evidence, and documentation." *In re American Consol. Transp. Companies, Inc.*, 470 B.R. at 491 (citing *Matter of T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 802 (5th Cir. 1997)).

> Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted the plan.

11 U.S.C. § 1129(b)(1). For purposes of this subsection, a plan is fair and equitable if the following requirements are met:

> (B) With respect to a class of unsecured claims---
>
> (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.

11 U.S.C. § 1129(b)(2)(B). In other words, to be fair and equitable, the plan must either provide for payment to the impaired class in the manner specified by § 1129(b)(2)(B)(i), or provide, pursuant to § 1129(b)(2)(B)(ii), that the holders of claims or interests which are junior to the impaired class will not receive or retain any property under the plan. *In re American Homepatient, Inc.*, 298 B.R. 152, 189 (Bankr. M.D. Tenn. 2003), *aff'd* 420 F.3d 559 (6th Cir. 2005), *cert. denied sub nom. Nexbank SSB, et al. v. American Homepatient, Inc., et al.*, 127 S.Ct. 55 (2006). Whether a plan is fair and equitable is a mixed question of fact and law, determined on a case-by-case basis. *Id.* (citing *In re Creekside Landing, Ltd.*, 140 B.R. 713 (Bankr. M.D. Tenn. 1992)). In the instant case, GTT objects that the Plan does not satisfy the "fair and equitable" requirement under either §1129(b)(2)(B)(i) or (ii).

1. <u>Section 1129(b)(2)(B)(i)</u>

Section 1129(b)(2)(B)(i) provides that a plan is fair and equitable if the holder of an unsecured claim receives or retains on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim.  If the debtor wishes to defer payments on a claim over a period of time, the debtor must pay the "present value" of the claim.  *In re American Homepatient, Inc.*, 298 B.R. at 189.  A creditor receives the present value of its claim "only if the total amount of the deferred payments includes the amount of the underlying claim plus an appropriate amount of interest to compensate the creditor for the decreased value of the claim caused by the delayed payment."  *In re MPM Silicones, LLC*, 531 B.R. 321, 332 (S.D.N.Y. 2015) (citing *Rake v. Wade*, 113 S.Ct. 2187, 2192 n. 8 (1993)).  Thus, the present value analysis requires the Court to examine whether the plan's proposed interest rate is sufficient to compensate the creditor for risks associated with the delay in payment.[26]

STC contends that GTT will receive the present value of its claim on the effective date of the Plan in the form of a note payable over nine years with interest. STC further contends that the debt to GTT is also effectively secured by 99% of the equity interests of the reorganized debtor. GTT counters that the proposed interest rate of 3% does not adequately compensate it for the time value of its money, and that it is entitled to 10%, the rate awarded in the judgment against STC.

An examination of the cases assessing interest rates in a chapter 11 cramdown reveals that courts have used a variety of approaches and reached varying results.  Many courts begin

---

[26] The concept of present value "is based upon the recognition that a dollar in hand today is worth more than a dollar due some time in the future." *In re Renegade Holdings, Inc.*, 429 B.R. 502, 523 (Bankr. M.D.N.C. 2010).  "The difference between these two values is referred to as the time value of money.  Lost opportunity to put the money to profitable use, the possibility of inflation, and the risk of nonpayment explain this difference in value." *Id.*

their analysis with a review of the Supreme Court's plurality decision in *Till v. SCS Credit Corp.*, 124 S. Ct. 1951 (2004).

In *Till*, the Court was asked to determine the appropriate interest rate in a chapter 13 case involving the cramdown of a secured claim under § 1325(a)(5)(B).[27]  The Court considered four approaches for calculating the interest rate: the coerced loan approach, the presumptive contract rate approach, the cost of funds approach and the formula approach.    The Court rejected the coerced loan, presumptive contract rate and cost of funds approaches[28] and instead adopted the "prime-plus" formula approach.  *Id.* at 1960-61.  Under the *Till* formula, a court uses the national prime rate as a base and then adjusts that rate upward for risk.  *Id.* at 1961.  According to *Till*, the appropriate size of the risk adjustment depends on "such factors as the circumstances of the estate, the nature of the security, and the duration of and feasibility of the reorganization plan." *Id.*   Although the plurality did not decide the proper scale for the risk adjustment, it noted that other courts have approved adjustments of 1% to 3%.  *Id.* at 1962.

*Till*, however, was a chapter 13 case.   While the decision is clear that the formula approach should be used in chapter 13 cases, the opinion is less clear about chapter 11 cases.  On the one hand, the Court noted that "the Bankruptcy Code includes numerous provisions that, like the [chapter 13] cramdown provision, require a court to 'discoun[t] … [a] stream of deferred payments back to the[ir] present dollar value.'"  *Id.* at 1958 (quoting *Rake v. Wade*, 113 S. Ct. 2187 (1993)). The "numerous provisions" cited by the Court included §1129(b)(2)(B)(i).  *Id.* at

---

[27] Section 1325(a)(5)(B) requires, in part, that the property to be distributed to a secured creditor over the life of the plan has a "value, as of the effective date of the plan" that equals or exceeds the value of the creditor's allowed secured claim.  11 U.S.C. § 1325(a)(5)(B)(ii).
[28] Under the coerced loan approach, courts must consider evidence regarding the market for comparable loans.  The presumptive contract rate approach is self-explanatory.  The cost of funds approach considers the creditor's cost of funds and "mistakenly focuses on the creditworthiness of the *creditor* rather than the debtor."  *Till v. SCS Credit Corp.*, 124 S.Ct. at 1961 (emphasis in original).

1958 n.10.    The Court then commented that "[w]e think it likely that Congress intended bankruptcy judges and trustees to follow essentially the same approach when choosing an appropriate interest rate under any of these provisions."  *Id*. at 1958-59.

In footnote 14, however, the Court suggested that the formula approach adopted by the plurality is not required in chapter 11 proceedings.  The Court observed that while there is no efficient market of willing cramdown lenders in chapter 13, the same is not true in chapter 11 cases.  *Id*. at 1959 n.14.    "Thus, when picking a cramdown rate in a Chapter 11 case, it might make sense to ask what rate an efficient market would produce."  *Id*.[29]

Based on footnote 14, some courts have declined to "blindly adopt" *Till's* formula approach in the chapter 11 context, finding that where an efficient market exists, the market rate of interest should be used.  *See, e.g., In re In re American Homepatient, Inc.*, 420 F.3d at 568. The courts that have adopted the *Till* formula in chapter 11 cases have done so because they found the plurality's reasoning persuasive, not binding.  For example, in *In re Texas Grand Prairie Hotel Realty, L.L.C.*, 710 F.3d 324 (5th Cir. 2013), the court found:

> *Till* was a splintered decision whose precedential value is limited even in the Chapter 13 context.  While many court have chosen to apply the *Till's* plurality formula method under Chapter 11, they have done so because they were *persuaded* by the plurality's reasoning, not because they considered *Till* binding.  Ultimately, the plurality's suggestion that its analysis also governs in the Chapter 11 context – which would be dictum even in a majority opinion – is not "controlling precedent."

*Id*. at 331 (emphasis in original).  The court ultimately approved the use of the *Till* formula under the facts of that case, but stated that "[w]e will not tie bankruptcy courts to a specific

---

[29] Some commentators have criticized footnote 14, noting that "[t]he problem with this suggestion is that the relevant market for involuntary loans in chapter 11 may be just as illusory as in chapter 13."  COLLIER ON BANKRUPTCY ¶ 1129.05[2][c][i] (16th ed. 2015).

methodology as they assess the appropriate Chapter 11 cramdown rate of interest; rather, we continue to review a bankruptcy court's entire cramdown-rate analysis only for clear error." *Id*. "[W]e do not suggest that the prime-plus formula is the only – or even the optimal – method for calculating the Chapter 11 cramdown rate." *Id*. at 337. *See also In re MPM Silicones,* LLC, 531 B.R. at 332 (court applies *Till* formula to a secured claim but uses 7-year treasury rate as the base); *In re Texas Star Refreshments, LLC*, 494 B.R. at 702 (finds that the 5% judgment rate is appropriate as the cramdown rate for an unsecured claim and in so holding, notes that it is not bound by *Till*, but finds the decision persuasive); *In re LMR, LLC*, 496 B.R. 410, 428 (Bankr. W.D. Tex. 2013) (court is persuaded by *Till* and applies formula approach to an unsecured claim).

The Court agrees that *Till* does not require use of the prime-rate formula approach in chapter 11 cramdown cases. Nor does the Court believe that *Till's* footnote 14 obligates the Court to determine the interest rate using an efficient market approach. Instead, footnote 14 only suggests that when choosing a cramdown rate in a chapter 11 case, the court *might* want to consider the rate an efficient market would produce.

What, then, is the appropriate interest rate in the case before the Court? In addition to being a chapter 11 case (and not a 13), the other obvious difference between this case and *Till* is that GTT's claim is an *unsecured* claim. Initially, it may appear that an unsecured creditor should receive a higher interest rate than a secured creditor. When the risks of confirmation and liquidation are compared, however, that is not necessarily true. An unsecured creditor's prospect of repayment "may indeed be enhanced if the debtor survives and the only other real alternative is liquidation." *In re Texas Star Refreshments, LLC*, 494 B.R. at 702.

GTT urges the Court to use the judgment rate of 10%.  It believes that the rate of 3% proposed by STC is not fair and is below the efficient market rate. GTT's witness, Mr. Haase, testified that no efficient market rate exists for STC to obtain a loan to pay GTT's $6,412,087.10 claim.[30]  Mr. Haase testified that in his experience, STC may be able to obtain a secured loan based on a percentage of the value of STC's assets.  The unrefuted liquidation value of STC was only $1,704,750.  The remaining testimony by Mr. Haase was based on conjecture of possible loans to pay the balance owed but only if the loans had certain enhancements such as guarantees and letters of credit.  There was no testimony of whether any insider or anyone related to the case had the financial ability to guarantee the loan or what collateral or enhancement could be used to back a letter of credit.  Thus, it seems clear to the Court that the efficient market approach is inapplicable.

In *Till*, the Supreme Court rejected the efficient market approach because it "imposes significant evidentiary costs, and aims to make each individual creditor whole rather than to ensure the debtor's payments have the required present value." *Till v. SCS Credit Corp.*, 124 S. Ct. at1960.  Additionally, the Court noted that the efficient market approach "overcompensates creditors because the market lending rate must be high enough to cover factors, like lenders' transaction costs and overall profits, that are no longer relevant in the context of court-administered and court-supervised cramdown loans." *Id*.  Mr. Haase testified that asset-backed interest notes would range between 4.5% and 6.5%, assuming sponsorship of the loan with personal recourse.  He suggested unsecured loans would be at a higher rate, possibly 7%, and need enhancements.

---

[30] As explained earlier in the Opinion, the final judgment amount was $5,052,118, plus prejudgment interest of $923,965 through October 31, 2013and post-judgment interest of $1,384.14 each day after October 31, 2013 ($1,384.14 x 315 days = $436,004.10).

Mr. Haase testified that a profit component was included in the higher interest rates.  As stated in *Till*, the efficient market rate overcompensates creditors, and it is simply not applicable here. The cramdown interest rate or present value interest is meant to put the creditor in the same economic position it would have been in had it received the value of the claim immediately. "The purpose is *not* to put the creditor in the same position it would have been in had it arranged a 'new' loan." *In re MPM Silicones, LLC*, 531 B.R at 333 (citing *In re Valenti*, 105 F.3d 55, 63-64 (2d Cir. 1997)) (emphasis in original).  "[T]he value of a creditor's allowed claim does not include any degree of profit.  There is no reason, therefore, that the interest rate should account for profit....  Otherwise, the creditor will receive more than the present value of its allowed claim." *Id*.

GTT further contends that if the Court chooses to apply the *Till* formula, the Court should start with the prime rate and upwardly adjust for risk.  The problem with doing so is that the prime rate already includes both a risk factor and a profit component over the risk-free Treasury note rates.  *In re LMR, LLC*, 496 B.R. at 436 (citing *Koopmans v. Farm Credit Services of Mid-Am., ACA*, 102 F.3d 874, 875 (7th Cir. 1996)).

STC proposes 3% by taking the 7-year Treasury rate and adjusting upward for risk. According to STC, the applicable Treasury rate at the time of the confirmation hearing was 1.87%.  STC's Exhibit OO.[31]  What, then, are the risks to GTT of STC not paying?  In determining the risk on an unsecured claim, the Court believes that it is necessary to consider what GTT would recover in a chapter 7 liquidation proceeding.  *See* Richard B. Gaudet & David L. Bury, Jr., *Zero Times Something is Still Zero*, 35-JAN AM. BANKR. INST. J. 36 (January 2016).

---

[31] Without objection from GTT, the Court took judicial notice of STC's Exhibit OO. The Exhibit, which is entitled "Federal Reserve Statistical Release" and dated February 8, 2016, sets forth applicable Federal Reserve rates.  While counsel for GTT referenced the 7-year rate, Exhibit OO shows that 1.87% is the 10-year rate.

The undisputed liquidation value of the company is $1,704,750 and if liquidated, GTT would receive only 25.98% of its claim. GTT's risk is based on the depreciation of the liquidation value. According to the testimony, GTT will be paid almost the entire liquidation value within one year of the Plan's effective date. Moreover, interest at 3% is being paid on GTT's entire claim, not just the $1.7 million at risk. If the Plan is successful, GTT will be paid 100%. In addition, GTT's payment is effectively secured by 99% of the debtor's equity, which will be held in the Creditor Trust.

In determining the appropriate size of the risk adjustment, *Till* considered such factors as (1) the circumstances of the bankruptcy estate, (2) the nature of the security, and (3) the duration and feasibility of the reorganization plan. *Till v. SCS Credit Corp.*, 124 S.Ct. at 1961. Courts following *Till* further assess the risk of the debtor's default on the restructured obligations based on such factors as (1) the quality of the debtor's management, (2) the commitment of the debtor's owners, (3) the health and future prospects of the debtor's business, (4) the quality of the lender's collateral, and (5) the feasibility and duration of the plan. *In re Texas Grand Prairie Hotel Realty, L.L.C.*, 710 F.3d at 334.

The circumstances surrounding the filing of this case were directly related to GTT's efforts to collect its judgment. The amounts owed to other secured and unsecured creditors appeared to be reasonable and timely paid. In fact, in the years of intense litigation with GTT and despite annual legal fees of up to $921,587, STC managed to pay its creditors and remain profitable. Regarding the "nature of the security," although GTT is not a secured creditor, its claim is effectively secured by 99% of the debtor's equity held in the Creditor Trust. The duration of the Plan is reasonable and based on the credible testimony of STC's witnesses and the Court's analysis, the Plan is feasible.

Considering additional risk factors, the Court finds from the testimony presented that the quality of the debtor's management is outstanding.  Brad Cross, STC's president, has been with the company from its inception.  His testimony proved that he understands product development, sales and operations, and that he is committed to doing everything possible to ensure the continued growth and success of the company.  Further, STC's expert, Richard Harmon, testified that the operations were "right sized" and designed to encourage customer loyalty.  Based on his conversations with customers who have been holding orders, Mr. Cross believes that business will increase after Plan confirmation.[32]  Mr. Harmon testified that STC would continue to benefit from its magnetic component side, which is the "cash cow" of the company.  This leads the Court to conclude that the health and future prospects of the business are stable.

In examining the "quality of the collateral," the Court again notes that GTT's claim is secured by the Creditor Trust holding 99% of STC's equity.   Considering the Court's conclusions regarding management, owner's commitment and the future health of STC, the Court finds that the quality of the "collateral" is very good.  Finally, as previously stated, the Court believes that the Plan is feasible.

Having made these determinations, the Court believes that the risk of nonpayment to GTT is minimal.  The judgment interest proposed by GTT is way beyond any efficient market rate or prime rate.  It would allow GTT to profit even more at the debtor's expense.  A portion of GTT's claim - approximately $1,359,969 - was generated from the prepetition judgment rate of 10%.[33]  GTT will benefit by receiving interest at 3% under the Plan on the interest already

---

[32] As can be expected in a technical industry, customers are reluctant to place orders with a company that may not make it out of bankruptcy.

[33] The Court recognizes that the analysis regarding the interest rate in the patent infringement case was in a different posture and served a different purpose than the interest rate adjustment serves in a cramdown proceeding.

assessed at 10%.  GTT will also be paid interest on its entire claim at the rate of 3%.  Thus, it

will be paid interest on the portion of its claim that is not at risk.  (The only risk GTT has is the

liquidation value of $1.7 million. It will receive interest of 3% on the remaining $4.7 million of

its claim, which it would not have collected if STC was liquidated.)  The interest rate of 3%

adequately compensates GTT for the "time value of money" component, as well as the risk

component.

2. Section 1129(b)2(B)(ii) – Absolute Priority Rule

Section 1129(b)(2)(B)(ii) contains the absolute priority rule, which requires the claims of

an objecting impaired class to be fully satisfied before any junior claims receive or retain

property under a plan.  The rule precludes equity owners from retaining an interest in the

reorganized debtor if a dissenting impaired class is not paid in full.  *In re Castleton Plaza, LP*,

707 F.3d 821, 821 (7th Cir. 2013), *cert. denied sub nom. Castleton Plaza, LP v. EL-SNPR Notes

Holdings, LLC*, 134 S. Ct. 146 (2013).

In the instant case, GTT objects that the Plan violates the absolute priority rule because it

allows the debtor's current equity holder, Brad Cross, to retain equity in the reorganized debtor

without satisfying GTT's claim in full. GTT's objection is premised on the argument that it is not

receiving the present value of its claim under the Plan under § 1129(b)(2)(B)(i).  The Court has

determined otherwise and therefore overrules GTT's objection regarding the absolute priority

rule.

See Order entered this date.


ENTERED: April 7, 2016

/s/ Laura K. Grandy
_____
UNITED STATES BANKRUPTCY JUDGE

37